UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LURIE CALVIN ANDERSON,

**Plaintiff,**

vs.                                                    Case No. 8:05-CV-237-T-27TGW

PARKWAY MAINTENANCE &
MANAGEMENT CO.,

**Defendant.**

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 35).  Upon

reconsideration, Defendant's motion is **GRANTED**.

Defendant filed it Motion for Summary Judgment on February 7, 2006 (Dkt. 35). In an order

dated April 13, 2006, *pro se* Plaintiff was advised of the provisions of Rule 56 in accordance with

*Johnson v. Pullman, Inc.,* 845 F.2d 911 (11th Cir. 1988) and granted until May 26, 2006 to file a

response to the motion. (Dkt. 39). Plaintiff did not file a response to Defendant's motion.

Defendant's Motion for Summary Judgment was granted and judgment was entered in favor of

Defendant. (Dkts. 44, 45). Plaintiff thereafter filed a Notice of Appeal and Motion for

Reconsideration, contending that he did not receive Defendant's Motion for Summary Judgment

(Dkts. 49, 53).[1]

---

[1] In denying Plaintiff's Motion for Permission to Appeal In Forma Pauperis, the Magistrate Judge found that the record refuted Plaintiff's claim that he did not have notice of Defendant's Motion for Summary Judgment as the district court had provided him notice of the provisions of Rule 56 and moreover, prior to entry of summary judgment, Plaintiff had signed the pre-trial statement which listed Defendant's Motion for Summary Judgment as pending (Dkt. 52). Notwithstanding these findings, the district court was unable to confirm that its order providing Plaintiff notice of the provisions of Rule 56 had been mailed to Plaintiff by the clerk's office.

1

As the Court was unable to confirm that its Rule 56 order had been mailed to Plaintiff by the clerk's office, Plaintiff's Motion for Reconsideration was granted and the summary judgment order was vacated. (See Dkt. 54). Plaintiff was granted leave to file a response to Defendant's Motion for Summary Judgment and the clerk was directed to again mail a copy of the order advising Plaintiff of the provisions of Rule 56. (Dkt. 54). Plaintiff filed his response on October 6, 2006 (Dkt. 56).

The order giving notice to Plaintiff of the provisions of Rule 56 expressly advised:

"Pursuant to Rule 56, the party opposing the motion must respond with counter *sworn* affidavits and/or materials or documents in opposition to the motion, setting forth specific facts showing that there is a genuine issue of material fact in dispute which should be litigated at the trial. If the opposing party does not respond to the motion for summary judgment or that party's response does not comply with the requirements of Rule 56 as stated above, the Court may declare that the facts in the affidavits and/or documents supporting the motion are established as true, that there is no genuine issue of material fact in dispute and summary judgment, if appropriate, shall be entered against the adverse party."

(Dkt. 39)

Notwithstanding the express provisions of this order and the requirement of Rule 56 that any counter affidavits be "*sworn*," Plaintiff's response to Defendant's Motion for Summary Judgment consists of nothing more than his own unsworn assertions. Plaintiff's response, therefore, does not raise a genuine issue of material fact. Accordingly, for the reasons discussed in the earlier order granting Defendant's Motion for Summary Judgment, Defendant's motion is granted. There are no genuine issues of material fact. Defendant is entitled to judgment as a matter of law.

Plaintiff initiated this action against Defendant Parkway Maintenance & Management Co. alleging that he was discriminated against because of his race. (Dkt. 1). Plaintiff alleges that while employed by Defendant he was required to perform "demeaning duties," was subject to "repeated racial insults and slurs," and "unfounded complaints" were lodged against him because he is African-

2

American. According to Plaintiff, he was "forced to resign" because "employment with [Defendant] became intolerable." (Dkt. 1). Viewing the allegations of the Complaint in the light most favorable to Plaintiff, he alleges claims of disparate treatment, hostile work environment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.*[2]  Defendant moves for summary judgment on all of Plaintiff's claims. (Dkt. 35).

## Factual Background[3]

Defendant is the maintenance company for a retirement community in Clearwater, Florida. (Moody Aff., ¶ 3). Plaintiff was hired by Defendant as a tree cutter in March 1996. (Colen Aff., ¶ 3). In 2000, Plaintiff was promoted to Foreman. *Id.* As Foreman, Plaintiff's duties included supervising the tree cutters, day laborers and the trash crew. *Id.* When needed, Plaintiff would also operate the forklift to assist contractors in installing air conditioning units. *Id.*

From 2000 until December 2002, Ron Seeley was Plaintiff's supervisor. (Colen Aff., ¶ 4). In December 2002, Seeley was terminated for performing side jobs for residents while on company time and while receiving overtime, which was in violation of company policy. *Id*; Schloss Aff., ¶ 5. According to Plaintiff, Seeley would perform side work for residents and have the residents write a check in Plaintiff's name. Plaintiff would then cash the check and Seeley would give Plaintiff a "couple of dollars." (Plaintiff Depo., pp. 87-88). When questioned by Laurie Schloss, the Human Resources Manager, Plaintiff denied that he had performed side work and denied having knowledge

---

[2] Attached to Plaintiff's handwritten complaint is a copy of a complaint purportedly filed in the Sixth Judicial Circuit in and for Pinellas County. (Dkt. 1). In the Pinellas County complaint, Plaintiff alleges discrimination in violation of 42 U.S.C. § 1981. To the extent Plaintiff incorporates the allegations in the Pinellas County complaint into his handwritten complaint, the analysis of his claims remains the same. Both Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Shields v. Fort James Corporation*, 305 F.3d 1280, 1282 (11th Cir. 2002).

[3] The factual background was derived from the evidence submitted by Defendant in support of its summary judgment motion. Defendant submitted Plaintiff's responses to Defendant's request for admissions, the affidavits of Laurie Schloss, Michael Moody and Leslie Colen, and portions of Plaintiff's deposition testimony. (Dkt. 36).

that Seeley had performed side work. (Plaintiff Depo., p. 87). Plaintiff lied to Schloss because he did not want Seeley to get in trouble. (Plaintiff Depo., pp. 91-92). Plaintiff testified that he did not care whether he acted in violation of company policy because he needed the money. (Plaintiff Depo., p. 113).

Mike Moody became Plaintiff's supervisor after Seeley was terminated. (Schloss Aff., ¶ 6). According to Plaintiff, Moody called Plaintiff "Pongo" approximately five times. Co-worker, Kevin Vereb, called Plaintiff "Pongo" approximately twenty or thirty times. (Plaintiff Depo., pp. 141, 156). Plaintiff did not know what "Pongo" meant but felt it was derogatory. (Plaintiff Depo., pp. 138-139). Plaintiff never asked Moody to stop calling him "Pongo" because he "just laughed it off" and felt they "were all friends." *Id.* On two occasions Moody said in a joking manner that Plaintiff was a white man trapped in a black man's body. (Plaintiff Depo, p. 157). According to Moody, he never made any comments or statements of a racial nature to or about Plaintiff. (Moody Aff., ¶ 13).

Plaintiff testified that Moody often yelled, cursed and insulted him. He called Plaintiff "fucking stupid," "liar," and "thief" and told him to "fucking leave" if he did not like it. (Plaintiff Depo., pp. 236, 256-57). According to Plaintiff, Moody lodged similar insults against Caucasian employees. (Plaintiff Depo., p. 257). Moody prohibited Plaintiff from wearing vendor gear, from leaving the property without permission, and did not invite Plaintiff to certain work meetings. (Plaintiff Depo., pp. 255-256, 288). According to Plaintiff, Moody put the same restrictions on Caucasian employees. (Plaintiff Depo., pp. 256, 290).

In late 2002, Defendant discovered that Plaintiff did not own a valid driver's license. (Colen Aff., ¶ 7). Thereafter, Plaintiff was prohibited from driving on company property. According to Plaintiff, Caucasian employees, Steve Burch and Mark Walsh, were permitted to drive on company property without a valid driver's license. (Plaintiff Depo. B, pp. 87, 89-90). On one occasion Moody

4

put his arm around Plaintiff's "shoulder and took his thumb and put it in [his] collarbone" and told him if he catches Plaintiff in a car again, he will kick Plaintiff's ass. (Plaintiff Depo. B, pp. 78, 95).

In January 2003, Plaintiff indicated on a Job Satisfaction Survey that he was "uncomfortable" with Moody. Plaintiff did not explain why he felt uncomfortable on the survey. (Colen Aff., Ex. A). Leslee Colen, Vice President and General Manager of Parkway Maintenance & Management Company, met with Plaintiff to discuss the survey. During the meeting, Plaintiff stated he was "bogged down" with work and that Moody gave him a "hard time" and treated him unfairly. Plaintiff "felt like [he] couldn't get anything done . . . [he] was doing the best [he] could, and every time [he'd] do something, [he] was either wrong or [would] get yelled at." (Plaintiff Depo., p. 201). According to Plaintiff, Colen told him she would do something to take "the load off" him. (Plaintiff Depo., p. 188). During the meeting, Plaintiff told Colen that he is a licensed arborist.[4] (Colen Aff., ¶ 9). Plaintiff did not complain of race discrimination or harassment. (Colen Aff., ¶ 9; Plaintiff Depo., pp. 167-168, 201).

Shortly after Plaintiff's meeting with Colen, Colen reassigned and narrowed Plaintiff's duties so that Plaintiff's job was limited solely to tree care and supervising the tree crew. (Colen Aff., ¶ 9). Colen gave Plaintiff a raise of fifty cents per hour. (Colen Aff., ¶ 10; Plaintiff Depo., p. 191). According to Colen, he reassigned Plaintiff's duties in order to address Plaintiff's concerns about having too much work and to maximize his abilities as an arborist. As a result of the reassignment, Plaintiff was no longer allowed to leave the property to pick up parts or interact with vendors. (Plaintiff Depo., p. 197). Plaintiff testified that the changes in his job duties helped lesson his work load. (Plaintiff Depo., p. 197).

---

[4] According to Plaintiff's testimony, he showed Colen his license to do pest control. (Plaintiff Depo., p. 169). In order to get his certification in pest control he was required to take a class in "ornamental turf," which includes instruction on trimming and pruning trees. *Id.* at p. 175.

Colen investigated Plaintiff's complaint that Moody made him feel uncomfortable by interviewing Moody and Plaintiff's coworkers. (Colen Aff., ¶ 13). Colen determined that Moody did not treat Plaintiff unfairly, but rather "Moody was a demanding boss who treated all employees equally." *Id.* According to Colen, "Moody's management style was more aggressive and demanding that Mr. Seeley's, and this caused employees of all races to complain about Mr. Moody." *Id.*

In January 2003, Defendant eliminated Saturday overtime for all employees except the waste management crew (a/k/a the "trash crew"). (Colen Aff., ¶ 11; Moody Aff., ¶ 8; Plaintiff Depo., p. 198). The waste management crew were the only individuals allowed to work weekends. (Plaintiff Depo., pp. 198-99). According to Colen, this decision was made as part of a reorganization effort to reduce cost. The decision was not made based on race. (Colen Aff., ¶ 11). Plaintiff testified that when he questioned Colen why he was not offered the opportunity to earn overtime, she told him "*for insurance reasons, something about . . . insurance companies' rates are real high.*" (Plaintiff Depo., p. 203). When Plaintiff asked Moody about reinstating his Saturday overtime, Moody said he "didn't need to work on Saturday because nothing was wrong. Everything was running smooth." (Plaintiff Depo., p. 204). Plaintiff testified that he did not believe that he was being denied Saturday overtime because of his race. (Plaintiff Depo. B, p. 91).

On or about January 15, 2003, Plaintiff told Laurie Schloss that Moody yelled at him for wearing a jacket that Plaintiff received from a vendor. (Schloss Aff., ¶ 8). Schloss explained to Plaintiff that it was against company policy to wear vendor gear or vendor logos. *Id.* Plaintiff informed Schloss that he had kept notes regarding Moody's unfair comments. *Id.* Schloss reviewed the notes and determined that Moody was merely enforcing company policy. *Id.* She instructed Plaintiff to keep taking notes and report back to her with any further concerns. *Id.* According to Schloss, Plaintiff never complained about racial discrimination or harassment. (Schloss Aff., ¶ 9).

6

In May 2003, Don Sikorski was hired as an Assistant Superintendent. (Colen Aff., ¶ 15). Sikorski was assigned some of Moody's responsibilities and assumed responsibilities relating to vendors, equipment and parts, and supervising the Foremen and their crews, including Plaintiff and his crew. (Colen Aff., ¶ 15). As a result of Plaintiff's reduction in duties and the hiring of Sikorski, Plaintiff was not responsible for dealing with vendors. (Moody Aff., ¶ 12). Plaintiff was not invited to attend meetings regarding vendor issues and his Nextel radio, which he had used in the past to communicate with vendors, was taken away. (Colen Aff., ¶ 15). According to Colen, Plaintiff had another radio which Plaintiff used to communicate with management and other staff. (Colen Aff., ¶ 15).

On May 30, 2003, as part of Defendant's Drug Free Workplace Policy, Plaintiff was given a random drug test. (Schloss Aff, ¶ 11). Before Defendant received the results of Plaintiff's test, on June 2, 2003, Plaintiff voluntarily terminated his employment with Defendant. (Schloss Aff., ¶ 12). Plaintiff testified that he quit because he "got sick" from a "double hernia" and because he was "stressed out" due to Moody's treatment. (Plaintiff Depo., pp. 302-303). According to Plaintiff, he would have continued employment with Defendant if he had not suffered from the hernia. (Plaintiff Depo., p. 308). On June 3, 2003, Defendant received the results of Plaintiff's drug test, which indicated the presence of marijuana. (Schloss Aff., ¶ 11).

## Applicable Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d

7

1256, 1259-60 (11th Cir. 2004) (internal citations omitted*).* "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

When a motion for summary judgment is filed and is supported by affidavits and/or other materials or documents, the party opposing the motion may not rely upon the mere allegations or denials of that party's pleadings to oppose or counter the motion for summary judgment. Pursuant to Rule 56, the party opposing the motion must respond with counter sworn affidavits and/or materials or documents in opposition to the motion, setting forth specific facts showing that there is a genuine issue of material fact in dispute which should be litigated at the trial. If the opposing party does not respond to the motion for summary judgment or that party's response does not comply with the requirements of Rule 56, the Court may declare that the facts in the affidavits and/or documents supporting the motion are established as true, that there is no genuine issue of material fact in dispute and summary judgment, if appropriate, shall be entered against the adverse party.

<u>Discussion</u>

**1.      Disparate Treatment**

"Disparate treatment" occurs when an employee is treated less favorably simply because of his protected characteristic. *See International Bd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To be successful on this type of claim, "proof of discriminatory motive is critical." *Id.* As Plaintiff has not offered any direct evidence of discriminatory motive, the *McDonnell Douglas* burden shifting framework is applicable. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

8

Pursuant to the *McDonnell Douglas* framework, a plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *Id.* If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate some legitimate non-discriminatory reason for the employment action. *Id.* Should the defendant carry its burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate, non-discriminatory reasons offered by the defendant were not its true reasons, but rather were a pretext for discrimination. *Id.* To establish a *prima facie* claim of race discrimination, in the absence of direct evidence of discrimination, Plaintiff must establish that: (1) he is a member of a racial minority; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. *See Knight v. Baptist Hospital of Miami, Inc.,* 330 F.3d 1313, 1316 (11th Cir. 2003).

Here, Plaintiff alleges he was treated less favorably than employees outside of his protected class because Defendant (1) changed his job responsibilities, (2) took away his Nextel radio, (3) did not invite him to certain meetings, (4) prohibited him from driving on company property without a valid driver's license, and (5) denied him the opportunity to earn overtime. Plaintiff has failed to demonstrate that any of these employment actions amount to discrimination.

Most of Plaintiff's complaints center around Defendant's decision to reassign his job duties. As a result of the reassignment, Plaintiff was no longer responsible for communicating with vendors. In turn, he was not invited to certain meetings and no longer needed a Nextel radio to contact vendors. The Eleventh Circuit has cautioned that "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *Davis v. Town of Lake Park,* 245 F.3d 1232, 1244 (11th Cir.

2001) ("[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities"). When a change in assignments or duties is not accompanied by any tangible harm, courts are reluctant to hold that the change amounts to an adverse employment action. *Davis*, 245 F.3d at 1244-45 (citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)) ("agreeing with other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes").

Defendant's decision to reassign Plaintiff's job responsibilities did not impact his pay or his job title as Foreman. In fact, Plaintiff received a fifty cent per hour raise. Plaintiff admitted that the reassignment came after he complained to Colen about being "bogged down" with work. Plaintiff admitted that the change in responsibilities helped lesson his workload. Simply put, Plaintiff's disagreement with Defendant's decision to reassign his job tasks in insufficient to meet the adverse employment action element absent some tangible harm or impact on his salary or job title. *See Davis*, 245 F.3d at 1244-45.

Similarly, Defendant's decision to take away Plaintiff's Nextel radio and its decision to revoke his driving privileges did not alter Plaintiff's pay or title. Plaintiff fails to establish that either decision prevented him from performing his job or had a tangible or material impact on his employment. Decisions, such as these, that do not result in some tangible, negative effect on the terms of Plaintiff's employment do not amount to adverse employment actions. *See Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) ("not every unkind act is sufficiently adverse;" "an employment action is considered adverse only if it results in some tangible negative effect"). While Plaintiff may not have agreed with Defendant's decisions, he has failed to establish that the decisions

10

were discriminatory. *See Davis*, 245 F.3d at 1244 (Title VII is not designed to make federal courts "sit as a super personnel department that reexamines an entity's business decisions"); *Higdon*, 393 F.3d at 1219 ("an employment action . . . is not adverse merely because the employee dislikes or disagrees with it and not everything that makes an employee unhappy is an actionable adverse action").[5]

In contrast to the other alleged employment decisions, an employer's decision to deny a plaintiff the opportunity to earn overtime has been recognized as an adverse employment action. *See Bass v. Bd. of County Comm'rs, Orange County, Fla.,* 256 F.3d 1095, 1118 (11th Cir. 2001). However, denial of overtime pay will constitute an adverse employment action only if the employee is deprived of compensation which he otherwise would have been entitled to or earned. *Id.* Here, the record demonstrates that as of January 2003, Plaintiff was not entitled to compensation for overtime work, as overtime work was eliminated for *all* employees except the waste management crew. Plaintiff has not identified any similarly situated employee outside of the waste management crew that was permitted to work overtime. To the contrary, Plaintiff testified that only the waste management crew was permitted to work on Saturdays. Colen testified that this decision was not based on race, but rather was made in an effort to reduce costs. Plaintiff fails to rebut Defendant's legitimate business reason. Accordingly, Plaintiff fails to establish a *prima facie* case of discrimination based on race. Defendant's motion for summary judgment on Plaintiff's disparate

---

[5] Even if Plaintiff could establish that Defendant's decision to take his Nextel radio away was an adverse employment action, Plaintiff fails to identify a similarly situated Foreman outside his protected class who was permitted to keep two radios. Neither has Plaintiff rebutted Defendant's legitimate business reason for taking away Plaintiff's radio. It is undisputed that after Plaintiff's responsibilities were reassigned, Plaintiff was no longer required to communicate with vendors via the radio.

Likewise, Plaintiff fails to rebut Defendant's legitimate business reason for revoking his driving privileges on company property. It is undisputed that Plaintiff did not have a valid driver's license and that Defendant's company policy prohibits employees from driving Defendant's vehicles on company property without a valid driver's license.

treatment claim is, therefore, granted.

>    **2.    Hostile Work Environment**

To establish a hostile work environment claim, Plaintiff must establish that (1) he is a member of a protected group, (2) he has been subjected to unwelcome harassment, (3) the harassment was based on the protected classification, (4) the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment," and (5) a basis for holding the employer liable. *Gupta v. Florida Board of Regents*, 212 F. 3d 571, 582 (11th Cir. 2000).

Plaintiff alleges he was subjected to a hostile work environment because Moody frequently yelled at him and called him derogatory names such as "Pongo," "liar," "fucking stupid," and "thief." Individually or in the aggregate, Plaintiff's claims do not constitute a hostile work environment. Significantly, Plaintiff fails to establish that the alleged harassment was based on Plaintiff's race. Other than Moody's comment that Plaintiff is a white man trapped in a black man's body, none of the complained of conduct was objectively racially charged.

The record establishes that Moody yelled and used derogatory names toward Caucasian employees as well.  Plaintiff testified that Moody prohibited Caucasian employees from wearing vendor gear and from leaving the property without permission. While Moody's  management style may have been abrasive and arguably inappropriate, Plaintiff has not established that Moody's behavior towards Plaintiff was motivated by race.  Harassment not based upon a protected characteristic is generally not actionable. *See McCollum v. Bloger*, 794 F.2d 602, 610 (11th Cir. 1986) ("[p]ersonal animosity is not the equivalent of sexual discrimination and is not proscribed by Title VII"); *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (a plaintiff

must establish he was subjected to the harassment because of his protected class; an environment equally harassing for all races does not constitute a hostile work environment).

Even assuming some of the comments and behavior were based on Plaintiff's race, the conduct complained of was not sufficiently severe or pervasive. The Supreme Court has identified several factors relevant to whether a work environment is hostile and abusive, including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating (as opposed to "a mere offensive utterance"); and (4) whether it unreasonably interferes with the employee's job performance. *Harris v. Forklift Syst., Inc.*, 510 U.S. 17, 23 (1993).

Plaintiff testified that Moody called him "Pongo" approximately five times and that he said jokingly that Plaintiff was a white man trapped in a black man's body only twice. Plaintiff testified that a co-worker called him "Pongo" approximately twenty or thirty times. These isolated incidents, the only alleged conduct arguably based on Plaintiff's race, fall short of establishing severe or pervasive harassment. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002) (quoting *Harris*, 510 U.S. at 21) (internal quotations omitted) (Title VII is not implicated as a result of an isolated "utterance of an epithet"). To be actionable, racial slurs and epithets must be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 (11th Cir. 1990). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) *(internal quotations and citations omitted).* "[I]t is repeated incidents of verbal harassment that continue despite the employee's objections that are indicative of

13

a hostile work environment and not simply some magic number of racial or ethnic insults." *Miller*, 277 F.3d at 1276 (quoting *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001)) (internal quotations omitted).   Plaintiff's allegations of harassment fall short of this standard. Therefore, Plaintiff fails to establish a *prima facie* case of a hostile work environment.   Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is granted.

### 3.    Constructive Discharge

Where an employer "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation," a plaintiff may bring a claim for "constructive discharge" in violation of Title VII. *See Doe v. Dekalb Co. Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997). In order to recover under a constructive discharge theory, Plaintiff must demonstrate that his employer imposed working conditions that are "so intolerable that a reasonable person in [the employee's] position would have been compelled to resign."   *Poole*, 129 F.3d at 553.   When determining whether an employee's working conditions were intolerable, an objective standard is applied. *See Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (citations omitted).

While Plaintiff may have subjectively perceived Moody's comments and management style as unfair or offensive, in light of the record evidence, a reasonable employee in Plaintiff's position would not have felt compelled to resign. As a result of Defendant's decision to reassign Plaintiff's job duties, Plaintiff's work load was lessened, yet he retained his title as Foreman and obtained a fifty cent per hour raise.   Plaintiff testified that he did not ask Moody to stop calling him "Pongo" because Plaintiff "just laughed it off" and felt they "were all friends."   While employed, Plaintiff did not complain of racial discrimination or harassment.   Moreover, Plaintiff testified that he voluntarily

14

terminated his employment because of a medical condition and that he would have continued his employment with Defendant if he had not suffered from the medical condition. Based upon the evidence of record, a reasonable person in Plaintiff's shoes would not have found the working conditions intolerable and would not have felt compelled to resign. Therefore, Plaintiff fails to establish a *prima facie* case of constructive discharge and Defendant's motion for summary judgment on this claim is granted. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 35) is GRANTED as to all of Plaintiff's claims. The Clerk is directed to enter judgment in Defendant's favor and close this case. Any pending motions are denied as moot.

**DONE AND ORDERED** in chambers this 20th day of November, 2006.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record, *pro se* Plaintiff